IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2019

## WILLIAM LANIER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-03059     James M. Lammey, Jr., Presiding Judge**

———————————

### No. W2018-01434-CCA-R3-PC

———————————

The Petitioner, William Lanier, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury conviction for premeditated first degree murder. On appeal, the Petitioner alleges that his two attorneys provided ineffective assistance of counsel relating to the following: (1) original counsel's investigation and preservation of an alibi witness's testimony; (2) trial counsel's investigation and presentation of a third-party defense at trial; (3) trial counsel's decision to call or not call certain witnesses; (4) trial counsel's failure to object to false or prejudicial testimony and statements by the State in closing; (5) trial counsel's failure to impeach a witness's reason for changing her statement; (6) trial counsel's failure to request a special jury instruction; (7) trial counsel's failure to object to testimony about a theft ring and counsel's eliciting testimony about the same; and (8) original counsel's failure to argue the motion to dismiss for lack of corpus delicti. The Petitioner also requests a new post-conviction hearing because the post-conviction court failed to make findings of fact related to two of his issues. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Shae Atkinson (on appeal), Memphis, Tennessee; Michael Working and Seth Segraves (at post-conviction hearings), Memphis, Tennessee; and Eric Mogy (in amended post-conviction petition), Memphis, Tennessee, for the appellant, William Lanier.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Jamie Kidd, and Tyler Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

On May 6, 2008, the Shelby County Grand Jury charged the Petitioner with the premeditated first degree murder of the victim, Tommie Reed. See Tenn. Code Ann. § 39-13-201; State v. William Lanier, No. W2011-01626-CCA-R3-CD, 2013 WL 5739793, at *1 (Tenn. Crim. App. Oct. 18, 2013), perm. app. denied (Tenn. Feb. 11, 2014).

At trial, the evidence established that on December 21, 2007, Memphis Police Lieutenant William Woodard encountered the victim's parked car with its lights illuminated in "a deserted area" shortly after midnight. Lanier, 2013 WL 5739793, at *1. Upon investigating and opening the unlocked passenger-side door, Lieutenant Woodard discovered the victim, who was deceased and had trauma to his head. Id. There was blood spatter throughout the passenger compartment. Id. The temperature of the interior of the car and the victim's body implied that the death was recent. Id. Crime Scene Investigator Demar Wells recovered a 9-millimeter shell casing and noted that the car's backseat was "junky" and did not appear as though someone had recently sat there. Id. The victim's car had previous exterior damage that may have been from gunshots; the damage was covered with Bondo, an adhesive repair product. Id. at *2.

Memphis Police Sergeant Anthony Mullins, an expert in bloodstain pattern analysis, testified that his examination of the blood spatter and the victim's wounds indicated that the victim was shot twice from the car's passenger side, that the victim was sitting upright when he was shot the first time, and that although the first shot could have been fired from inside or outside the car, the second shot was fired from outside the car. Lanier, 2013 WL 5739793, at *2. The victim was shot first in the right jaw and then in the center of his forehead near the hairline. Id.

Memphis Police Detective Michael Jackson testified that in October or November 2007, the victim began working as a confidential informant with the automobile theft task force regarding a car burglary or theft ring. Lanier, 2013 WL 5739793, at *2. The victim named the Petitioner as one of the individuals in the ring, and the Petitioner was arrested on December 3, 2007. Id. He was later released on bond. Id. Detective Jackson informed Sergeant Joe Stark, who investigated the victim's murder, that the Petitioner could be a potential suspect. Id. Other named members of the ring included Walter Chalmers, Maridis Mason, Ernest Jones, Rodney Starks,[1] and Christopher Criswell. Id.

---

[1] Both Rodney and Ladarion Starks, who were brothers, are discussed in this case. For clarity, we will refer to them by their first names. We intend no disrespect. In addition, because Ladarion referred to himself as Darion during his trial testimony and no consistent spelling of Ladarion appears in the post-conviction record, we will use Darion when referring to him.

The victim's information led to the arrests of Rodney, Mr. Mason, Mr. Chalmers, and the Petitioner; Mr. Criswell and Mr. Jones were not arrested based upon the victim's information. Id. at *3. To Detective Jackson's knowledge, Rodney, Mr. Mason, and Mr. Chalmers did not threaten or assault the victim as a result of their arrests. Id.

Later, in March 2008, Detective Jackson was one of several officers who arrested the Petitioner. Lanier, 2013 WL 5739793, at *3. The Petitioner attempted unsuccessfully to flee. Detective Jackson searched the Petitioner's mother's home with her consent and recovered a restaurant employment application bearing the victim's name. Id.

Dr. Marco Ross performed the victim's autopsy and testified that both gunshot wounds were fatal and injured the brain. Lanier, 2013 WL 5739793, at *3. The gunshot to the jaw was fired from at least three feet away, and the gunshot to the forehead was fired from less than three feet. Id.

Kimbercy Washington, the mother of the victim's child, testified that she saw the victim around 10:20 p.m. on the night of the murder when she picked up their child from him. Lanier, 2013 WL 5739793, at *3. He was repairing a car belonging to a man nicknamed "Little John." Id. Ms. Washington collected the child from the victim and called the victim three times throughout the evening to ask him to buy milk. Id. During the last conversation, which occurred between 11:00 and 11:30 p.m., she described the victim as "agitated." Id. He told her that he "needed to call her back because he was in the car with someone." Id.

After the victim's death, the Petitioner called Ms. Washington and asked if the police knew who killed the victim. Lanier, 2013 WL 5739793, at *4. Ms. Washington answered negatively, and the Petitioner asked her to call him if she discovered who was responsible. Id. Although Ms. Washington was acquainted with the Petitioner, he did not ordinarily call her and, as a result of this conversation, she suspected that the Petitioner killed the victim. Id. Ms. Washington denied that "there were a lot of people out looking for" the victim. Id. Ms. Washington knew that the victim was working with the police. Id.

Johnathan Hobson, whose nickname was "Big John," testified that he worked as a barber in an apartment complex and knew both the victim and the Petitioner. Lanier, 2013 WL 5739793, at *4. The night before the victim died, he came to the apartment complex to work on a car owned by Mr. Hobson's brother, Johnny Anderson, whose nickname was "Little John." Id. The victim ultimately worked on Mr. Hobson's car instead. Id. When the victim and Mr. Hobson parted ways, the victim asked Mr. Hobson if he had seen the Petitioner. Id. Mr. Hobson responded negatively, and the victim

walked toward the Petitioner's apartment. Id. Mr. Hobson was informed of the victim's death by a three-way call from the Petitioner and one of the victim's family members, who threatened Mr. Hobson. Id.

Keith Harris, the victim's brother-in-law, testified that he saw the victim's car drive past his house at 11:15 p.m. on the night of the victim's death. Lanier, 2013 WL 5739793, at *4. The car's windows were tinted and Mr. Harris could see that two people were in the car, although he could not identify them. Id.

Sierra Stornes, the mother of the Petitioner's child, testified that the victim and the Petitioner were friends. Lanier, 2013 WL 5739793, at *4. On December 21, 2007, the victim came to Ms. Stornes's apartment to see the Petitioner. Id. The victim and the Petitioner went into a bedroom, spoke briefly, and left the apartment; the Petitioner put a 9-millimeter handgun the victim had given him into his pocket. Id. One to one and one-half hours later, Ms. Stornes's aunt, Laveatrica Mosby, who also lived in the apartment complex, came to Ms. Stornes's apartment and told her the Petitioner had sent her there "to retrieve bullets." Id.

Ms. Stornes walked to Ms. Mosby's apartment and found the Petitioner standing outside. She described him as "scared, nervous, frightened, or shocked." Lanier, 2013 WL 5739793, at *5. Inside Ms. Mosby's apartment, the Petitioner told Ms. Stornes that he killed the victim and swore on his father's grave that he was telling the truth. Id. They went back to Ms. Stornes's apartment, where the Petitioner told Ms. Stornes that after leaving their apartment, he and the victim encountered Darion. Id. After speaking for a few minutes, the Petitioner and the victim left; the Petitioner asked the victim to park the car and drew his gun as if they were preparing to steal a car. Id. The Petitioner asked the victim "why he snitched on" the Petitioner; the victim asked what the Petitioner was talking about; and the Petitioner shot the victim in the head twice to ensure he was dead. Id. The Petitioner told Ms. Stornes that he shot the victim once "on the side, once in the forehead." The Petitioner stated that he threw his gun in a body of water, removed his sweater, and left it in a drainage ditch near a high school. Id. The Petitioner told Ms. Stornes that he killed the victim because the victim "was supposed to have snitched on him like a week before[.]" Id. The Petitioner threatened to kill Ms. Stornes if she revealed his involvement in the murder. Id.

Ms. Stornes testified that she called Crime Stoppers in January 2008 because she felt it was not right for the Petitioner to be free when the victim was dead. Lanier, 2013 WL 5739793, at *5. On March 9, 2008, she gave her first police statement. Id. On June 19, 2009, defense investigator Clark Chapman interviewed her at her mother's house. Id. Ms. Stornes told Mr. Chapman that she had fabricated her initial statement because she was angry at the Petitioner for having sex with another woman. Id. Ms. Stornes further

told Mr. Chapman that she had guessed where the victim was shot due to neighborhood gossip about the way the victim looked at his funeral. Id. Ms. Stornes "maintained that she lied to the investigator because the [Petitioner] called her from jail and hinted that he wanted her to lie so that he could be released from jail and help take care of their son." Id. Ms. Stornes stated that she believed the Petitioner and wanted help caring for her son. Id. Ms. Stornes further stated "that she was telling the truth at trial because the victim's family needed closure and because her son did not need to be around someone who had committed murder." Id. Ms. Stornes acknowledged that she and the Petitioner fought about another woman, but denied that their relationship ended prior to the murder. Id. at *6. After the murder, Ms. Stornes and the Petitioner ended their relationship, and she gave her police statement. Id.

Patricia Stevenson, the victim's mother, testified that the victim looked "as though nothing was wrong with him" at his funeral and that his manner of death could not have been determined by looking at him. Lanier, 2013 WL 5739793, at *6. Marcus Orr, who was acquainted with both the Petitioner and the victim, testified that on the night of the victim's death, he saw the two men together in front of a nightclub. Id. Mr. Orr was accompanied by Darion and two women. Id. Mr. Orr estimated that the time was around 12:30 a.m. because "the club [was] jumping, and like usually, that's the time the club [was] jumping." Id. The victim pulled up to Mr. Orr in his car and rolled the car window down. Mr. Orr stated that "everyone was having a good time" and that he saw no signs of violence. Id.

Darion testified for the defense that on the night of the victim's death around 11:30 p.m., he was riding around with Mr. Orr and two women when he saw the Petitioner and the victim in a car together outside a nightclub. Lanier, 2013 WL 5739793, at *6. Darion "flagged down" the victim, and they exited their respective cars and talked for fifteen to twenty minutes. Id. Everyone appeared to be having a good time. Id. During the conversation, the Petitioner told Darion that he thought the victim had "snitched on him" to the police, but the Petitioner did not seem upset. Id.

Darion testified regarding a prior 2007 incident in which he, Rodney, and the victim encountered Mr. Criswell and Mr. Criswell's girlfriend at a nightclub. Lanier, 2013 WL 5739793, at *6. Mr. Criswell's girlfriend told them that they needed to leave because someone was going to "shoot the car up," but she did not elaborate on the potential shooter's identity. Id. As they left, someone in a Ford Mustang pulled up beside them and shot at the car. Id. They reported the incident to police. Id.

Ms. Stornes was recalled as a witness and testified that in November 2007, she and Erica Smith discussed Ms. Smith's having had sex with the Petitioner. Lanier, 2013 WL 5739793, at *7. Ms. Stornes denied having been angry during the discussion and

described it as a "normal talk." Id. Ms. Stornes did not discuss the victim's death with Ms. Smith or speak with her after November 2007. Id. Ms. Stornes estimated that the Petitioner and the victim left her apartment around 9:00 p.m. and went to her aunt's apartment around 11:00 p.m. Id.

Sergeant Stark testified that during the investigation of the victim's murder, Detective Jackson provided him with a list of eight people who were involved in the ring. Lanier, 2013 WL 5739793, at *7. Sergeant Stark stated that "Williams" and Serita[2] Harris told him that Mr. Hobson was in the car with the Petitioner and the victim on the night of the victim's death. Id.

Erica Smith testified that in November 2007, she and Ms. Stornes argued about an alleged affair Ms. Smith was having with the Petitioner. Lanier, 2013 WL 5739793, at *7. At some point thereafter, Ms. Smith asked Ms. Stornes why she implicated the Petitioner in the victim's murder. Id. Ms. Stornes replied, "Just to be lowdown." Id. Ms. Smith said that Ms. Stornes's statement was made during a "heated argument" and that Ms. Stornes was angry about the Petitioner's relationship with Ms. Smith. Id. Ms. Smith averred that she did not disclose Ms. Stornes's statement to police because she did not want to become involved in the murder case. Id.

Upon this evidence, the Petitioner was convicted of premeditated first degree murder and sentenced to life in prison. Lanier, 2013 WL 5739793, at *7. Relevant to the issues presented here, on direct appeal, the Petitioner argued that he was denied his right to a speedy trial, that the evidence was insufficient to support his conviction, that the trial court improperly limited cross-examination of witnesses, and that the State committed prosecutorial misconduct during its examination of witnesses and closing argument. Id.

Relative to his speedy trial rights, the Petitioner contended that the State unreasonably delayed the trial for almost three years by alleging a witness, Anthony Walker, heard the Petitioner make a statement against interest in jail regarding the murder. In the interim, the Petitioner's alibi witness, Nathaniel Carter, passed away. Id. This court concluded that although delay had occurred in the Petitioner's case, it was partially due to the defense's requests for continuances. Id. This court recounted the following procedural history:

> The record reflects that the [Petitioner] was arrested on March 27, 2008. Thereafter, on May 6, 2008, a Shelby County Grand Jury returned the indictment charging the [Petitioner] with first degree murder. The

_____

[2] Serita is referred to as "Sharita" in the opinion on direct appeal. However, the post-conviction record reflects that her name is spelled Serita.

parties initially agreed on a trial date of April 3, 2009. However, on February 25, 2009, [original] counsel requested a continuance "to complete the investigation." Thereafter, on July 9, 2009, [original] counsel agreed to an August 13, 2009 "hearing date." At a December 3, 2009 hearing, the State asked for a motions date of January 28, 2010, noting that [original] counsel had "filed motions on the murder case and the robbery case." On January 28, 2010, [original] counsel "asked for a reset date of March 4th on this matter."

On April 6, 2010, the [Petitioner's] original . . . counsel withdrew from representation and [trial] counsel was appointed. On May 10, 2010, newly appointed [trial] counsel announced that the parties had arrived at a tentative trial date of October 25, 2010. [Trial] counsel called the [Petitioner] for voir dire, during which the [Petitioner] agreed that he requested the October 25 trial date. At a July 1, 2010 hearing, the State asked for a continuance of a report date because a family member was in the hospital. [Trial] counsel agreed to the new motions date, noting that he had filed several motions for consideration.

Thereafter, on August 12, the prosecutor asked the trial court to order a mental evaluation of the [Petitioner], noting that a supplemental police report reflected the [Petitioner] had informed the police that he was schizophrenic and not taking his medication. The State asserted that the October 25th trial date did not need to be reset. [Trial] counsel stated that the [Petitioner] "concur[red] with the need for evaluation as long as his trial date is not set off." The court admonished the [Petitioner] that he needed to cooperate if he wished to keep the October 25th trial date.

During a September 16, 2010, hearing, the [Petitioner] requested new counsel and stated, "I'm trying to go to trial." The State responded that the [Petitioner] had refused to cooperate with the evaluation and indicated that he wanted to waive the evaluation. [Trial] counsel acknowledged that the [Petitioner] "should have had an evaluation done years ago." The trial court again admonished the [Petitioner] that he needed to cooperate with the evaluation in order to get his trial. The [Petitioner] asserted that he was competent to stand trial. The court agreed but said the evaluation needed to be performed. The [Petitioner] complained that he had been incarcerated for almost three years. The court responded that it was not the fault of the State that the [Petitioner] was not cooperating.

On October 26, 2010, another hearing was held. The court noted that because of the delay in completing a mental evaluation, the trial date needed to be rescheduled. Because of the crowded court docket, the parties agreed on February 7, 2011, as a trial date.

Thereafter, a hearing was held on February 23, 2011, regarding motions filed by defense counsel. The trial court noted that the trial had been reset because of a problem that [trial] counsel had; however, the court did not clarify the nature of the problem. At the hearing, [trial] counsel made a motion in limine to exclude the testimony of Sierra Stornes.

Lanier, 2013 WL 5739793, at *8-9. This court noted that "most, if not all, of the delays were agreed to by the [Petitioner] so that the parties could fully investigate the case. In fact, several delays were actively sought by the defense." Id. at *9. The Petitioner did not file a motion for a speedy trial, and although he stated at several hearings that he wanted to go to trial, he did not cooperate with trial counsel or the doctors conducting the mental evaluation. Id.

Relative to Mr. Carter, this court concluded that "the [Petitioner] did not raise the issue of an alibi witness until the motion for new trial" and was not entitled to relief. Id.

Relative to the sufficiency of the evidence, this court noted that the Petitioner's primary argument centered on Ms. Stornes's credibility, which was the province of the jury. Lanier, 2013 WL 5739793, at *12. This court concluded that the evidence was sufficient to sustain the Petitioner's conviction. Id.

Relative to cross-examination of the witnesses, the Petitioner contended that the trial court should have allowed Detective Jackson to be questioned about the "handling of confidential informant information" and Ms. Stevenson to be questioned about an incident in which another person threatened to kill the victim. Lanier, 2013 WL 5739793, at *14. This court first stated that the issues had been waived for failure to cite to the record in the appellate brief. Id. This court proceeded to consider the first issue and concluded that the trial court did not abuse its discretion, noting that the Petitioner elicited information regarding three other members of the car theft ring who had motive to kill the victim and that the Petitioner had not explained how more detailed information of the police department's procedures for handling confidential informants would have benefitted his defense. Id. at *15. This court did not address the issue regarding Ms. Stevenson's cross-examination relative to the incident in which the victim was threatened by a neighbor. Id.

-8-

Relative to prosecutorial misconduct, the Petitioner argued that the State improperly elicited information about the Petitioner's prior arrests during trial from Detective Jackson, made prejudicial references to his being part of the theft ring, and improperly commented during closing arguments on the Petitioner's failure to testify by discussing his lack of alibi. Lanier, 2013 WL 5739793, at *15.

This court concluded that Detective Jackson's testimony concerning the theft ring was relevant to the Petitioner's motive to kill the victim. Lanier, 2013 WL 5739793, at *16. Relative to the Petitioner's contention that the references to his being part of the theft ring "heighten[ed] an image of criminal behavior," this court concluded that many references to the ring arose from trial counsel's cross-examining witnesses in an attempt to establish third-parties' motives to kill the victim. Id. at *17.

Relative to closing arguments, the Petitioner contended that the State improperly commented on the Petitioner's lack of alibi, which implicitly commented on his decision not to testify. Lanier, 2013 WL 5739793, at *17. This court noted that in response to the defense's third-party argument, the prosecutor said the following in rebuttal:

> [Trial counsel] tells you that his client was dropped off and that the killers went on to kill [the victim], right? You didn't hear from an alibi witness, did you? You know that the [Petitioner] has the power to subpoena people. You've heard from his witnesses. But you didn't hear from an alibi witness, did you?

Id. This court concluded that the Petitioner did not contemporaneously object, that the remarks were "only a minimal portion of the arguments," that the proof of the Petitioner's guilt was overwhelming, and that the remarks likely had "little, if any" effect on the verdict. Id.

On August 21, 2014, the Petitioner filed a pro se petition for post-conviction relief, alleging numerous grounds of ineffective assistance of counsel, including failure to raise a third-party defense and failure to request a special jury instruction. The post-conviction court appointed counsel, and on January 30, 2015, counsel filed an amended petition. The amended petition did not incorporate the pro se petition by reference and raised the following issues relevant to this appeal:

(A) Trial Counsel, [original counsel's name][3] failed to thoroughly investigate alibi witnesses[.]

---

[3] The amended petition inaccurately listed both original counsel and trial counsel as having represented the Petitioner at trial, and original counsel was mistakenly listed as having represented the Petitioner on direct appeal.

. . . .

> (D)     Trial Counsel [original counsel's name] failed to thoroughly investigate the [S]tate's witnesses[.]
>
> (E)     Trial Counsel [original counsel's name] failed to object to false, misleading, or prejudicial testimony and/or evidence presented by the [S]tate.
>
> . . . .
>
> (G)     Trial Counsel [original counsel's name] and counsel [trial counsel's name] failed to file timely pre-trial motions[.]

On May 1, 2015, appointed counsel withdrew, and post-conviction counsel was appointed.

### A. September 6, 2016 post-conviction hearing

Original counsel testified that he represented the Petitioner between 2008 and 2009 "from the time the allegations occurred through the time [the Petitioner] was indicted and . . . some time period after that." Original counsel noted that he had almost no memory of the Petitioner's case beyond his review of the case file. Original counsel stated that "early on" he hired Mr. Chapman as an investigator. Original counsel filed a motion to dismiss for "lack of corpus delicti," but he did not remember having argued the motion. Original counsel noted that the Petitioner's case "was a pre-Bishop[4] case" and that he thought the motion would have been well-taken at the time. Original counsel did not know why the motion was not argued. Original counsel recalled that the Petitioner's case "really did come down to" Ms. Stornes's statement to police that "either [the Petitioner] said he did it or right after he came and told [her] to get rid of the bullets[.]" Original counsel opined that the statement was not "well supported by any corroborating evidence" and that Ms. Stornes gave differing accounts of the relevant events to Mr. Chapman, some of which benefitted the Petitioner. Original counsel noted that "there was tons of third[-]party guilt in this case"

Original counsel did not recall requesting jail telephone call recordings or remember whether jail telephone calls were the basis of a motion to revoke the Petitioner's telephone privileges. Although counsel did not remember how often he met

---

[4] See State v. Bishop, 431 S.W.3d 22, 61 (Tenn. 2014) (abandoning the traditional corpus delicti rule).

with the Petitioner, in general, he was able to meet and talk with criminal defendants in Shelby County once every thirty days. Original counsel affirmed that he filed pretrial motions and met with the Petitioner.

Original counsel testified that he also represented the Petitioner in an aggravated burglary case[5] arising from the information the victim gave as a confidential informant indicating that the Petitioner was involved in a car theft ring. Seven other individuals were indicted in connection with the ring. The Petitioner's involvement in the theft ring and subsequent indictment were the alleged motive for the murder. Original counsel recalled that two other individuals had shot at or attempted to kill the victim and that part of the Petitioner's defense was that "lots of people" were trying to kill the victim.

Original counsel did not remember why he withdrew from the case and denied doing so because the Petitioner filed three bar complaints against him. He noted that clients commonly filed bar complaints against him. Original counsel did not remember the substance of the Petitioner's bar complaints. Original counsel stated that the State asked for and received a continuance, that the Petitioner was "absolutely adamant about [a] speedy trial," and that the Petitioner became upset with original counsel and "that may have been what led to our attorney-client breakdown." Original counsel did not recall discussing alibi witness Mr. Carter with the Petitioner or the need for a speedy trial based upon Mr. Carter's health.

On cross-examination, original counsel testified that at the time he represented the Petitioner, he had been practicing law for six to eight years and had conducted sixty to eighty trials. Upon questioning by the post-conviction court, original counsel testified that he did not recall whether he represented the Petitioner at the preliminary hearing. The post-conviction court noted the "numerous resets" in the case before original counsel was permitted to withdraw on March 29, 2010. Trial counsel was appointed on April 6, 2010.

Original counsel noted that the order allowing him to withdraw "ha[d] some very strange but interesting language in it" indicating it was the Petitioner's "fault" counsel was withdrawing. Original counsel did not remember whether a plea offer was made during the time he represented the Petitioner, although he recalled that he was both preparing for trial and "also [working] to put this case in a posture where it might settle[.]"

---

[5] The record reflects that in the time period before the murder case was resolved, the Petitioner had outstanding charges for aggravated robbery, burglary of a motor vehicle, theft over $1,000, and failure to appear. The witnesses at the post-conviction hearing referred to these charges differently throughout the proceedings.

The prosecutor interjected at this point, noting that other witnesses testified that the Petitioner was going to "get" the victim and that the blood spatter expert established that the evidence was consistent with a close-range shot to the side of the head. The prosecutor stated that Ms. Stornes knew some details "that were presented at trial that were not made public" and that only "someone who had heard this information or seen this crime directly could have known."

Trial counsel testified that he was appointed to the Petitioner's case after original counsel withdrew. Trial counsel noted that he had given post-conviction counsel his entire case file and was not able to review it before the hearing. Trial counsel did not remember why he did not argue the corpus delicti motion.

Trial counsel testified that he continued to work with Mr. Chapman to investigate the case. Trial counsel did not recall seeing a memorandum relating to Mr. Carter as an alibi witness; he stated later, though, that he was "sure" he reviewed any memoranda Mr. Chapman produced. Trial counsel remembered being told that there was an alibi, but that Mr. Carter had passed away.

Trial counsel stated that after he joined the Petitioner's case, it moved "pretty quickly." Trial counsel agreed that he and the State requested that the Petitioner undergo a mental evaluation. He recalled reviewing the State's discovery file pursuant to their open-file policy, although he did not remember when he did so. Trial counsel did not independently search for witnesses. Trial counsel agreed that Ms. Mosby was one of the witnesses at trial, although he did not remember to which facts she testified.

Trial counsel did not recall discussing with the Petitioner tire tracks found next to the victim's car, although he remembered going to the crime scene to look for the tracks. Trial counsel stated that the tire tracks were gone by the time he went to the scene. When asked whether he only visited the crime scene on the day before closing arguments, trial counsel responded that if he said such in his closing argument, then that was correct. Trial counsel did not use a photograph of the tire tracks to discern the make and model of tire that made them. He did not know why he did not do so, and he did not know whether the tire tracks were important. Trial counsel agreed that the victim was a confidential informant as well as part of an auto theft ring and that multiple people were "out for" the victim.

Trial counsel testified that he spent an "inordinate amount of time" discussing with the Petitioner his being on telephone restriction and "the fact that him being on the phone [did not] help him." The Petitioner was "adamant that for some reason his phone restriction had something to do with" trial counsel. Trial counsel did not request any jail telephone recordings.

Upon questioning from the post-conviction court, post-conviction counsel noted that Ms. Stornes recanted her initial statement inculpating the Petitioner, citing a jail telephone conversation with the Petitioner and stating that she fabricated the story to retaliate against the Petitioner because he was unfaithful to her. Post-conviction counsel stated that the jail telephone call recordings were relevant to the truthfulness of Ms. Stornes's statements. He noted, though, that he had been unable to locate any such recordings and was working to obtain them.[6]

Trial counsel testified that he generally had investigators attend trials, although he did not remember whether Mr. Chapman attended the Petitioner's trial. Trial counsel would not have been surprised if Mr. Chapman interviewed Ms. Stornes. Trial counsel did not remember whether he asked Mr. Chapman to meet with Ms. Stornes in person. Trial counsel agreed that, hypothetically, if Ms. Stornes testified inconsistently with her statement to Mr. Chapman, "the smart thing to do" would have been to call Mr. Chapman as an impeaching witness. When asked why he did not call Mr. Chapman as a witness at trial, trial counsel stated, "Probably because that hypothetical scenario or situation did not occur." Trial counsel did not meet with Ms. Stornes in person prior to trial. Trial counsel remembered that Ms. Stornes testified regarding the reason for her inconsistent statements. When asked why he did not call Mr. Chapman as a witness to continue impeaching Ms. Stornes, trial counsel responded, "Maybe that was my trial strategy. I don't recall."

Relative to Ms. Stornes's testimony, trial counsel recalled that she gave a defense-favorable statement as well as "another statement that was the complete opposite of that." Trial counsel noted that "several flip-flops" occurred in her statements and that combined with "the other problems with the case," the State made an informal fifteen-year plea offer, which trial counsel conveyed to the Petitioner in a letter. The Petitioner rejected the offer against counsel's advice.

Trial counsel remembered calling Ms. Smith as a witness to testify that Ms. Stornes admitted to lying about the Petitioner's committing the murder. Trial counsel agreed that Mr. Chapman's testimony would have bolstered Ms. Smith's testimony.

Trial counsel reviewed part of a discovery supplement consisting of text messages sent to the victim by Ivetta[7] Willis. Trial counsel recalled reviewing the text messages, but he did not remember investigating the owner of the telephone number displayed in

---

[6] No recordings appear in the record on appeal.

[7] Ivetta Willis is also called Yvette, Avita, and Vita in the post-conviction hearing transcript, but all of the names appear to refer to the same person.

the messages. Trial counsel did not remember calling Darion as a witness. Upon questioning by the post-conviction court, post-conviction counsel stated that Darion testified about the previous shooting incident involving the victim's car. Post-conviction counsel stated that Rodney, who had been subpoenaed at trial but did not testify, would have given similar testimony that would have bolstered Darion's testimony. Trial counsel did not remember any issue involving Rodney at trial.

Trial counsel testified that the other members of the car theft ring were suspects in the victim's murder and that his trial strategy involved raising the possibility that a third party killed the victim. Trial counsel did not recall whether he investigated Mr. Mason, although he agreed that if Mr. Mason were part of the theft ring, he would have had motive to harm the victim. Trial counsel recalled Mr. Mason's giving a false statement to Mr. Chapman that he was in custody in Mississippi at the time of the murder. Trial counsel did not know why he did not request a curative jury instruction after successfully objecting to Ms. Stornes's referring to the Petitioner's pending robbery charge. Trial counsel stated that the trial transcript would reflect whether he objected during the State's rebuttal argument.

Upon questioning by the post-conviction court, post-conviction counsel stated that trial counsel referenced the Petitioner's alibi in closing,[8] that the State commented on the defense's failure to prove an alibi, and that the issue was raised on appeal. This court concluded that the issue had been waived for failure of trial counsel to contemporaneously object. The prosecutor interjected that this court examined the issue and concluded that the proof was overwhelming and that the remarks had little if any effect on the verdict.

On cross-examination, trial counsel testified that at the time of the Petitioner's trial, he had been practicing law for nine or ten years, that he had conducted at least sixty trials, and that he had been involved in between five and ten first degree murder trials. Trial counsel stated that the Petitioner "got an inordinate amount of [counsel's] time, personally and in written form."

Trial counsel testified that he impeached Ms. Stornes with her prior inconsistent statements at trial, including having her state that she had recanted both her statements to police and Mr. Chapman. Trial counsel agreed that if he chose not to call other witnesses "to say the same thing," it was trial strategy. Trial counsel agreed that he called Sergeant Stark as a trial witness, who testified regarding the other individuals involved with the theft ring.

---

[8] The trial transcript reflects that trial counsel posited that the Petitioner was dropped off by the victim and that later, a third party murdered the victim. The alibi referenced by Mr. Carter was not advanced at trial.

Trial counsel testified that it was "not good practice" to call every witness who might testify to the same set of facts. He stated that part of his trial strategy was to pick a couple of witnesses and "run with it," taking into consideration input from his client. Trial counsel noted that the Petitioner gave "a lot of input." Trial counsel agreed that he ultimately decided "what [came] in, when to object, the procedural aspects of that trial[.]"

On redirect examination, trial counsel testified that he did not meet with Ms. Mosby in person before trial, explaining that he generally did not speak to witnesses before trial because his experience had "shown that having a witness get up and say oh, you remember when I told you this" was to be avoided "at all costs."

Upon questioning by the post-conviction court, trial counsel testified that he represented the Petitioner for about eleven months and that he visited the Petitioner regularly in jail as well as during court appearances. Trial counsel noted an "extraordinary amount of letter exchanges." Relative to the fifteen-year plea offer, trial counsel stated that the Petitioner also had several pending theft and burglary charges related to the theft ring; counsel thought that the additional charges may have arisen from the information the victim provided to police.

Mr. Chapman testified that he worked with both original counsel and trial counsel investigating the Petitioner's case, although he primarily recalled working with original counsel. Mr. Chapman generally made himself available to testify as part of his investigative services. He identified memoranda summarizing three interviews with Ms. Stornes on March 30, 2009, April 17, 2009, and June 19, 2009, which were received as exhibits.

The March 30, 2009 memorandum stated that Ms. Stornes was reluctant to speak with Mr. Chapman, that they discussed the Petitioner's potential life sentence, and that Ms. Stornes stated that she wanted the Petitioner's son to know him. After being told the defense was unlikely to subpoena her to testify but that the State likely would, Ms. Stornes gave a statement generally consistent with her first police statement and eventual trial testimony, but she did not mention the Petitioner's wanting to remove bullets from the apartment. When asked whether she was sure the Petitioner killed the victim, Ms. Stornes responded that the Petitioner knew the victim had been shot in the front and side of the head and that the Petitioner had to have been there. Ms. Stornes also stated that she knew the Petitioner stole vehicles and vehicle parts with Antonio Banks, Mr. Mason, Joseph Vann, and the victim. She also knew that the victim had "set them up to get them all arrested" as part of a deal with the police. She further said that "[e]veryone was out to get [the victim] back." Ms. Stornes stated that after the Petitioner came to their

apartment, he spent all night awake and looking out of the window "afraid someone was coming for him."

Mr. Chapman noted that during the first interview, Ms. Stornes told him that she told the police the Petitioner killed the victim. Mr. Chapman agreed that Ms. Stornes was not helpful in the first interview. He conducted the second interview as a follow-up because "[it] seemed like there was something in question about her" or Ms. Stornes had "more to tell." Mr. Chapman noted that Ms. Stornes changed her story and "was kind of wavering a little bit[.]"

The April 17, 2009 memorandum reflected that Mr. Chapman confronted Ms. Stornes regarding her conflict with the Petitioner due to his relationship with another woman. Ms. Stornes stated that she did not know about the other woman until after the Petitioner had been arrested. Ms. Stornes said, "I'm not going to lie because I don't want my child to get hurt for what he did to someone else's child." She reiterated that the Petitioner told her he killed the victim. When asked about the Petitioner's telling someone to remove bullets from the apartment, Ms. Stornes elaborated that the Petitioner first went to Ms. Mosby's apartment and told her to tell Ms. Stornes to "get the bullets out of the house." Ms. Stornes did not know to which bullets Ms. Mosby referred. Ms. Stornes denied that the Petitioner told Ms. Mosby about the murder. Ms. Stornes was confident that the Petitioner committed the murder because "he was breathing real hard and he was scared looking out [of] the blinds and everything." She said that later in the evening, one of the Petitioner's friends picked him up, which was the last time she saw the Petitioner. Ms. Stornes stated that she knew the victim and that he came to her apartment the night of his death. She recalled that it was dark, although she did not know the time, and said, "I guess they were going to steal cars." Ms. Stornes stated that the Petitioner was angry with the victim.

The June 19, 2009 memorandum reflected that on June 17, 2009, Ms. Stornes called Mr. Chapman requesting an in-person meeting. Ms. Stornes told him that on the night of the victim's murder, the victim came to her apartment around 8:55 p.m. while the evening news was on television. He and the Petitioner left shortly thereafter, and the Petitioner returned about forty-five minutes later. The Petitioner, who was acting normally, did not talk about being angry with the victim or killing him. The Petitioner did not leave the apartment after that point, and the following morning, they learned that the victim had been killed. After the victim's death, Ms. Stornes and the Petitioner argued because he had sex with Ms. Stornes's friend. Ms. Stornes stated that as a result of the argument, she gave detectives false information against the Petitioner. When asked how she knew the location of the victim's gunshot wounds, Ms. Stornes said that she heard some women talking about how the victim "was shot in the face and the makeup was not good on the body at the funeral." Ms. Stornes stated that the detectives

"kept coming, stopping by in the middle of the night, in the daytime, calling and everything."  She stated that she gave the detectives "that confession" because she was still arguing with the Petitioner about his affair.  When asked whether she was being pressured or threatened to give her new statement, Ms. Stornes replied, "No, I just feel it is right, he shouldn't be sitting in a jail cell for something he didn't do." Mr. Chapman testified that Ms. Stornes's credibility had "fall[en] apart" by the third interview.

Mr. Chapman identified a memorandum detailing his May 1, 2009 interview with Mr. Carter.  Mr. Chapman recalled that Mr. Carter had cancer and that Mr. Carter thought the Petitioner would have been working for him on the day of the murder to repay Mr. Carter for bond money from a previous arrest.  Mr. Carter asked Mr. Chapman to verify the date on which the Petitioner posted bond.  Mr. Chapman did not remember following up on that line of investigation.  Mr. Chapman stated that he may have spoken to Mr. Carter again and did not remember when Mr. Carter died.  When asked whether Mr. Carter asked Mr. Chapman to expedite his investigation due to Mr. Carter's cancer, Mr. Chapman responded that Mr. Carter felt that the Petitioner had been at his house during the relevant time period but that Mr. Carter did not have any documentation and "just went by his memory[,] . . . there was nothing else he could really elaborate on."

The May 1, 2009 memorandum was received as an exhibit and reflected that Mr. Carter "revealed he ha[d] an aggressive case of cancer and his leg was amputated last March."  Mr. Carter previously worked as a police officer for twelve years.  Mr. Carter stated that he posted bond for the Petitioner the "last time he was arrested" and that for four to five weeks, the Petitioner assisted Mr. Carter with photography work each weekend.  Mr. Chapman said that "due to his recollection of when he learned of [the Petitioner's] arrest," he believed that the Petitioner would have been with him on the night of the murder.  Mr. Carter requested that Mr. Chapman research when the Petitioner was released on bond before the murder.

Mr. Chapman identified April 6, 2009 and April 21, 2009 memoranda detailing two interviews with Ms. Mosby, which were received as exhibits.  The April 6, 2009 memorandum reflected that Ms. Mosby denied having seen the Petitioner on the night of the victim's murder or his having told her anything about it.  She also denied that the Petitioner ever came to her apartment appearing nervous or upset.  The April 21, 2009 memorandum reflected that Ms. Mosby "appeared surprised" when Mr. Chapman told her about the Petitioner's allegedly asking her to tell Ms. Stornes to remove bullets from their apartment.  Ms. Mosby denied that this ever occurred.  Ms. Mosby was "very clear . . . that she [was] not going to lie and cover up for anyone, she [was] only telling the truth."

Upon questioning by the post-conviction court, post-conviction counsel stated that Ms. Mosby was "not a very good witness at trial," that she was called to impeach Ms. Stornes, and that Mr. Chapman's recollection of Ms. Mosby's demeanor during her interview was relevant to her possibly having "some kind of mental issues." Mr. Chapman stated that he did not remember much about the first interview other than that Ms. Mosby was "a little evasive" or "acting a little strange about things." He stated that during the second interview, Ms. Mosby was also acting strangely and had a "different recollection" of events.

The post-conviction court interjected to inquire whether the State filed a demand of notice of alibi, which was eventually located in a January 19, 2011 omnibus motion.

Mr. Chapman testified that he visited the Coahoma County, Mississippi jail to interview Mr. Mason. Mr. Chapman recalled that Mr. Mason was indicted as a co-conspirator in the car theft ring and that he was a potential suspect in the victim's murder. Mr. Mason told Mr. Chapman that he was incarcerated at the time of the murder, but Mr. Chapman later discovered that Mr. Mason had been released from jail on the date of the victim's murder. Mr. Chapman agreed that his findings were contained in a March 30, 2009 memorandum to original counsel.

Mr. Chapman testified that he attempted to interview Anthony Walker but was ultimately unable to do so. An August 4, 2009 memorandum indicated that Mr. Walker communicated through his attorney that he did not know the Petitioner or the victim or have any knowledge of the murder. Mr. Walker's attorney told Mr. Chapman that he had known Mr. Walker for "some years" and that Mr. Walker would have told him if he had known anything about the Petitioner's case.

Mr. Chapman testified that on January 28, 2010, the prosecutors asked to speak to him because at a pretrial meeting, Ms. Stornes claimed that Mr. Chapman was harassing her and that her inconsistent statements arose from "just want[ing] to give [him] a story to go away." Mr. Chapman stated that he attended the trial but did not remember hearing Ms. Stornes's testimony. He noted that if he were an anticipated witness, he would have been excluded from the courtroom during the other witnesses' testimony. Mr. Chapman denied having been provided five compact disc containing recordings of jail telephone calls.

On cross-examination, Mr. Chapman agreed that Ms. Stornes's last statement was consistent with her trial testimony. Relative to Mr. Carter's interview, Mr. Chapman stated that the Petitioner worked for Mr. Carter on Friday, Saturday, and some Sunday nights, but that Mr. Carter did not tell him which hours the Petitioner worked. Mr. Chapman did not remember Mr. Carter's saying that "he was by [the Petitioner's] side

every second of those nights they worked together." Although Mr. Carter stated "something . . . about photography and . . . certain times at the club that" the Petitioner worked during the relevant time period, he did not provide any supporting documentation to Mr. Chapman.

Upon examination by the post-conviction court, Mr. Chapman testified that his investigation was "pretty extensive" and that he "did a lot of tracking down" of various people. Mr. Chapman charged a total of $12,000 in the Petitioner's case. When asked whether Mr. Chapman told original counsel the urgency of Mr. Carter's medical issues, Mr. Chapman stated that he included a summary of Mr. Carter's condition in his memorandum. Mr. Chapman said that Mr. Carter "would just show up at a club and take the couples' photos and charge them" and that Mr. Carter never produced anything to support his claim that the Petitioner was with him the night of the victim's murder. When asked whether Mr. Chapman could have impeached Ms. Stornes when she admitted to having changed her story, post-conviction counsel responded that Ms. Stornes gave inconsistent reasons for changing her story and that Mr. Chapman could have testified to the reason she gave for recanting her original and revised statements.

The post-conviction court noted for the record that another judge signed the order relieving original counsel from the case, which stated that the Petitioner requested a new attorney in open court. The order noted that original counsel was relieved "due to the conflict created by the [Petitioner], solely."

## B. March 27, 2018 post-conviction hearing

Kenneth Stevenson, the victim's father, testified that he spoke to Sergeant Stark on several occasions and that he assisted Sergeant Stark as best he could. Mr. Stevenson denied having spoken to Sergeant Stark about Roderick Neal, "arguments that may have gone on with the neighbors," or threats Mr. Neal made against the victim's life. Mr. Stevenson further commented regarding the Petitioner, "Let him rot in h-ll."

Post-conviction counsel stated that he subpoenaed twelve individuals to the post-conviction hearing regarding trial counsel's failure to raise a third-party defense. Rodney had died six months before the hearing date; Darion was unable to be located; and Ms. Stornes's mother had called counsel's office and refused to testify. According to post-conviction counsel, Ms. Stornes's mother would have testified regarding a conversation with Ms. Stornes in which Ms. Stornes admitted to having inculpated the Petitioner because she was angry with him for having sex with another woman. The post-conviction court stated that this testimony would have been cumulative and inadmissible in light of Ms. Stornes's acknowledgment at trial that she had changed her story.

Post-conviction counsel also noted that he had subpoenaed Detective Jackson, who was unavailable on the hearing date. Post-conviction counsel intended to question Detective Jackson about the victim's being a confidential informant and a list of suspects that Detective Jackson provided to Sergeant Stark. Post-conviction counsel stated that no proof of a car theft ring had been provided to the Petitioner in discovery, that the Petitioner was never charged with being a part of a theft ring, only burglary of a motor vehicle as a single defendant, and that no documents established that the victim was, in fact, a police informant. The prosecutor noted that at trial, Detective Jackson testified that none of the people on his list of individuals in the theft ring had threatened the victim apart from the Petitioner.

Trial counsel was recalled as a witness and agreed that the State's theory at trial was that the Petitioner killed the victim because he informed the police of the Petitioner's involvement in the car theft ring. When asked whether the theft ring was discussed "throughout" the trial, trial counsel stated that he recalled its being mentioned "a few times" and that it was "an aspect" of the trial. Detective Jackson and Sergeant Stark testified at trial regarding the ring. Trial counsel did not request a Rule 404(b) instruction or other special jury instruction that the Petitioner was "still to be presumed innocent of that crime[.]" Trial counsel stated that if he represented the Petitioner on the underlying burglary of an automobile charge, he was appointed. Trial counsel noted that his "focus was on defending the murder." When asked whether he was aware that the Petitioner was not a co-defendant in the cases of other individuals involved in the theft ring, trial counsel stated, "I'll accept that information if you say that's correct." Trial counsel did not recall Mr. Criswell's "having a prior report for shooting up [the victim's] car[.]"

Trial counsel recalled investigating Mr. Neal's verbally threatening to kill the victim. Trial counsel identified an April 13, 2009 memorandum composed by Mr. Chapman, which stated that the victim was driving in a car with Darion and Rodney when Mr. Criswell "shot up the car[.]" Trial counsel agreed that Darion testified at trial and could not identify the shooter. Trial counsel did not remember whether he spoke to Rodney or subpoenaed him as a witness. Trial counsel agreed that the memorandum referenced a Memphis Police Department incident report relating to the shooting. Trial counsel did not know when the shooting incident occurred.

Trial counsel testified that the Petitioner was difficult to work with and that they "[c]onstantly" had "[h]eated altercations," although he denied that the arguments ever became physical. Trial counsel said that the Petitioner was a "prolific letter writer" and that the Petitioner had sent several letters to the bar against counsel's advice.

Trial counsel did not recall which defenses he raised in the Petitioner's case. Trial counsel identified a February 1, 2011 letter from counsel's legal assistant to the

Petitioner, which requested that the Petitioner provide "additional alibi witnesses such as club owners, patrons that saw [the Petitioner] with Mr. Carter or any other direct evidence that show[ed he was] at a location other than the scene of the murder" in order to "give a proper response to the [S]tate's alibi request." Counsel's legal assistant noted that in her opinion, Mr. Carter's statement provided the Petitioner with an alibi.

Trial counsel did not remember meeting with Ms. Stornes, although "it seems that ma[de] sense" to have done so; he stated that if he did not meet with Ms. Stornes before trial, his associate did. Trial counsel recalled that after the guilty verdict in the murder case, the burglary of a motor vehicle charge was dismissed.

Trial counsel recalled Darion's trial testimony that he saw the victim and the Petitioner at a club about thirty minutes before the murder. Trial counsel could not remember what testimony he intended to elicit from Darion. He agreed that if Mr. Chapman's memorandum reflected that Darion had reported being present during the previous shooting incident with the victim and Mr. Criswell, it was accurate. Trial counsel did not remember whether he met with Darion or Rodney before trial.

Relative to the letter in which trial counsel conveyed the State's informal plea offer, trial counsel testified that the State never made a formal offer because the prosecutor believed that the Petitioner would not accept a ten- or fifteen-year sentence. The State "floated" several offers in hopes of progressing the case. Trial counsel agreed that the letter was dated about one month before trial. He noted that his "biggest failure in this case was not being able to come up with the words that . . . [the Petitioner] could comprehend that he had won" by eliciting the State's informal offer of fifteen years to resolve all of his cases.

The January 14, 2011 letter from trial counsel to the Petitioner detailed the State's unofficial fifteen-year offer and conveyed trial counsel's advice that the Petitioner "strongly consider any offer less than life[.]" Trial counsel also stated in the letter that the Petitioner was "insane to not consider" the offer and would be "stupid or ret---ed" to reject it. Trial counsel stated that the case was one of circumstantial evidence, that his trial strategy was to create reasonable doubt, that they would introduce Ms. Stornes's contradictory statements, and that they might offer Ms. Mosby's testimony to paint Ms. Stornes as "a pathologic liar," although trial counsel was concerned Ms. Mosby would change her testimony before trial. Trial counsel noted that the defense "evidence will at best state that 'others had motive to do it,['] and 'everybody else is lying[.]'" He noted that the other parties' arrest histories, "statements by others saying who wanted to kill" the victim, the victim's record as a confidential informant, and the arrests tied to the victim's information were "important" but did not convey "what juries like to hear most[,] . . . that the defendant . . . didn't do it."

-21-

In the letter, trial counsel stated that he had a "bad feeling" about the case due to the Petitioner's personality and proceeded to discuss the Petitioner's "pathological insistence" on raising the issue of the Petitioner's telephone privileges in the trial court. Trial counsel stated that the issue arose before he represented the Petitioner and that in his opinion, "[the Petitioner's] time on the phone [was] probably why [his] case was not dismissed." Trial counsel said that after speaking with the prosecutor, his "instincts were dead on" and that "the [S]tate ha[d] been pretty firm in holding the line against the [Petitioner] with a real s---ty case" because the Petitioner created "a horrible impression on the [S]tate by what they listened [to] on [his] jail recordings." Trial counsel hypothesized that the Petitioner's "pop[ping] off by the mouth" on the telephone left an impression that he would not "take any reasonable offer." Trial counsel noted that the Petitioner's description of his last court appearance "was completely opposite of what everyone else including your prior attorney stated . . . was actually going on." Trial counsel complained of the Petitioner's seeing "significant in mundane items" and expressed counsel's fear that the Petitioner's "odd 'viewpoint' of issues" would "take over in this matter."

Trial counsel concluded the letter by saying he had not "accepted or rejected s---," that he did not have the offer in writing and was "not going to waste time with offers if [he didn't] have to," and outlined the Petitioner's potential sentence for the murder, aggravated robbery, burglary of a motor vehicle, theft over $1,000, and failure to appear charges. He reiterated that the Petitioner was "tempting fate" by not seriously considering the fifteen-year offer. Trial counsel noted that he met with the State on January 13, 2011 and "picked up a couple things" out of the State's file. In a post-script, trial counsel begged the Petitioner to accept the plea offer and stated that if he rejected the offer, he did so "at [his] own peril." Trial counsel noted that he had a feeling that a jury would "view [the Petitioner] poorly as most people do, even with the weakness of the [S]tate's case. In a nutshell, because [the Petitioner was] not the most . . . likeable guy, a jury [might] convict [him] regardless of the questionable evidence." Trial counsel noted multiple times in the letter that he was documenting his advice in writing for purposes of post-conviction review.

When asked whether it was fair to say that trial counsel spent more time attempting to convince the Petitioner to accept a plea offer rather than preparing for trial, trial counsel testified, "No. That wouldn't be fair at all." Trial counsel stated that he told the Petitioner "on numerous occasions" that Ms. Stornes was the State's key witness. Trial counsel recalled that two female witnesses were "slow" or had "learning disabilities," in his opinion; he noted that this information was not a revelation at trial. When asked whether Ms. Mosby's appearing "stupid or catatonic – like she[] had a stroke almost" was a surprise at trial, trial counsel responded, "I don't recall that she . . .

was catatonic . . . . I don't recall any of . . . the adjectives that you used to describ[e] her."

On cross-examination, trial counsel testified that he advised the Petitioner to stop writing letters to the bar because he "had a tendency to include information that may [have been] privileged, and his perception of reality [was] just kind of warped." Trial counsel agreed that he thought the letter writing could hurt the Petitioner at trial. Trial counsel remembered speaking to Mr. Chapman, although he did not remember if Mr. Chapman was "active" by the time counsel was appointed. Trial counsel had the investigation file and was "sure" he had regular meetings with Mr. Chapman.

Relative to Mr. Chapman's interview with Ms. Mosby, trial counsel agreed that most of Ms. Mosby's knowledge of the relevant events came from Ms. Stornes, that Ms. Mosby spoke about the Petitioner's wanting to "get rid of the bullets and the gun," and that "it would make sense" to minimize the amount of testimony regarding the Petitioner's confession. Trial counsel did not recall Ms. Stornes's trial testimony, but he agreed that Ms. Stornes admitted on cross-examination that she lied and that Ms. Smith said Ms. Stornes had admitted to lying because of her anger at the Petitioner. Trial counsel stated that he impeached Ms. Stornes about her conflicting statements in order to benefit the Petitioner. Trial counsel said that he investigated as many of the potential third-party suspects and alibi witnesses provided by the Petitioner as he "reasonably could because [the Petitioner] was exceptionally . . . demanding as a client."

The Petitioner testified and identified an investigative supplement from Sergeant Stark dated December 22, 2007. In the supplement, Sergeant Stark noted that Mr. Stevenson reported that Mr. Neal, a neighbor, had threatened to kill the victim "when he caught him." The supplement also contained information regarding other incidents of violence against the victim, including the victim's car being shot while in Mr. Stevenson's driveway. Further, Ms. Stevenson reported to Sergeant Stark that "a guy named Chris" shot at the victim less than one year before the murder.

In a continuation of the supplement dated February 15, 2008, Sergeant Stark sent a "Cat Team" to locate Mr. Neal; they were unable to locate him. The Petitioner noted that elsewhere in his discovery file, there was information that Mr. Neal and the victim "shot[] back and forth at each other[.]" The Petitioner stated that during Ms. Stevenson's trial testimony, she described an incident in which Mr. Stevenson and the victim argued with Mr. Neal because he flirted with Ms. Stevenson. The trial court found that the testimony did not directly pertain to the victim's murder and was not relevant. Mr. Stevenson did not testify at the trial. The Petitioner agreed that Mr. Chapman followed up on investigating Mr. Neal and obtained a police report related to the event; he said, though, that Mr. Neal's and the victim's shooting at one another should have been

investigated. No documents related to the shooting between Mr. Neal and the victim were present in the discovery materials.

The post-conviction court interjected and stated that as part of the police report, the detectives noted that they could not contact Mr. Neal, who was listed as the victim, and therefore did not follow up. The Petitioner stated that Mr. Neal was located three or four days before trial because he had a pending charge in criminal court. The Petitioner averred that "they never . . . even [tried] to look into it until like three or four days before trial." The Petitioner noted that he did not know Mr. Neal and had never met him. Mr. Neal was subpoenaed but not called as a witness, and the Petitioner never saw "a statement or memo or anything." Based upon what trial counsel told the Petitioner, Mr. Neal was never brought to the courtroom in spite of being in custody. The Petitioner stated that Mr. Chapman was subpoenaed but sat outside the courtroom and was never called as a witness.

The Petitioner testified that he met Mr. Criswell, who was nicknamed "Crazy Chris," in the court holding cell on April 28, 2008, before the Petitioner's preliminary hearing in General Sessions court on an aggravated robbery charge. The Petitioner noted that the discovery materials in the murder case reflected that Mr. Criswell was a defendant in the car theft ring case. The Petitioner agreed that Mr. Criswell "may have had whatever motive [the Petitioner] was alleged to have" and that Mr. Criswell previously "shot up" the victim's car. The Petitioner stated that although witnesses testified at his trial that bullet holes in the victim's car were from the previous shooting, no one testified regarding Mr. Criswell's involvement in the shooting.

The Petitioner identified an investigatory supplement authored by Sergeant J.T. Max on December 22, 2007, which discussed Mr. Criswell and the previous shooting. Mr. Chapman followed up on the information in the supplement and included it in his memorandum dated April 13, 2009.

The Petitioner testified that he asked trial counsel to investigate both Rodney and Darion. The Petitioner claimed that trial counsel never investigated Rodney, but did investigate Darion immediately before trial and call him as a witness. The Petitioner said later, though, that trial counsel never investigated Darion. Darion's testimony was ultimately helpful to the State. Darion told Mr. Chapman that he had been speaking to the prosecutor and that the State anticipated calling Darion as a trial witness.[9] After the State rested, trial counsel decided to call Darion as a defense witness. The Petitioner stated that Darion was not charged in the car theft ring, but later said that he was. The Petitioner agreed that Darion and Rodney may also have had a "beef" with the victim.

---

[9] We note that none of Mr. Chapman's memoranda reflect Darion's speaking to the State.

-24-

The Petitioner further agreed that trial counsel called a defense witness who had the same motive to kill the victim as the Petitioner. The Petitioner opined that trial counsel should have called Rodney instead of Darion because Darion's testimony—that he saw the victim with the Petitioner and that the Petitioner told Darion the victim had snitched on him—corroborated Ms. Stornes's testimony that the Petitioner said that he saw Darion on the night of the murder. The Petitioner noted that Darion's testimony was not a surprise and was contained in his initial police statement.

The Petitioner testified that trial counsel called Darion as a witness in order to question him about the shooting involving Mr. Criswell. The State objected and the trial court found the testimony to be inadmissible because both trial counsel and the prosecutor agreed that Darion did not know the identity of the shooter. The Petitioner noted that Sergeant Stark was not permitted to testify about the previous shooting because he did not have first-hand knowledge of the shooter's identity. The Petitioner opined that because Rodney knew the shooter's identity, he should have been called as a trial witness. The Petitioner noted that Rodney had been killed six months before the post-conviction hearing.

The Petitioner complained that although trial counsel "promised the jury" in his opening argument that they would hear evidence of people who bore a grudge against the victim and that they would hear testimony from Mr. Criswell, trial counsel never called Mr. Criswell or any other witnesses who had a motivation to kill the victim. The Petitioner stated that the defense theory was "actions speak louder than words" and that trial counsel did not support the theory with the witnesses he called.

The Petitioner testified that another third party who should have been raised as a potential suspect was Mr. Hobson or "Big John," who was the victim's barber. The victim got a haircut from Mr. Hobson on the day of his murder and worked on Mr. Hobson's car.

The Petitioner agreed that on the day of the murder, Ms. Washington called the victim three times to ask when he would be back with milk and diapers for their daughter. The Petitioner stated that trial counsel "constantly referred to a . . . certain conversation [Ms.] Washington supposedly had . . . [with the victim] on the night of his murder" a few minutes before his death. The State objected on the basis of hearsay, and the trial court found that if the content of the conversation was to prove the victim's state of mind, it would be allowed into evidence. Although Ms. Washington testified about the conversation to "some degree," the Petitioner averred that trial counsel should have used Ms. Washington's police statement to refresh her recollection. Ms. Washington told the police that around 11:15 p.m., the victim stated that he was dropping off Little John. At 10:42 p.m., the victim also spoke on the telephone with his girlfriend, Ms. Harris, and

told her he was transporting Little John's brother to AutoZone. The Petitioner opined that Big John, Little John, and Mr. Criswell should have been identified as alternative suspects by trial counsel.

The Petitioner testified that Mr. Willis sent a threatening text message to the victim shortly before his death including the phrase, "This time it won't be long." A statement regarding the text message was included in Sergeant Stark's December 23, 2007 supplement. The Petitioner noted that Ms. Harris's police statement included the name of a man from whom the victim was caught stealing.[10] The Petitioner further noted that the victim set up Mr. Mason to be arrested as part of the car theft ring, but Mr. Mason escaped. Although Mr. Mason claimed to have been in jail at the time of the victim's murder, Mr. Chapman's investigation revealed that Mr. Mason had been released two days before the murder.

An investigative memorandum dated October 4, 2009 was received as an exhibit and reflected a summary of the witnesses interviewed and the contents of their statements. Mr. Criswell provided a statement acknowledging that multiple people were "out to get the victim" and that "they" said "they would kill him if they caught up with him[.]" Mr. Chapman noted that the prosecutor claimed that Mr. Walker was "around [the Petitioner] in the jail and now had information that was damaging" to the Petitioner's case. However, Mr. Chapman reiterated that Mr. Walker denied having spoken to detectives regarding the case. Mr. Chapman also noted that Mr. Mason's alibi had been disproven and that pending further instructions from counsel, he felt the investigation was complete.

Relative to Mr. Carter, the Petitioner testified that although he informed original counsel of his alibi in 2008, original counsel wanted to wait for Mr. Chapman to be hired to investigate. Mr. Chapman interviewed Mr. Carter in May 2009. Original counsel began to pursue a plea agreement, which the Petitioner did not want, and discussed having Mr. Carter perform a videotaped deposition in order to secure Mr. Carter's statement. The Petitioner's case was continued several times due to other witnesses coming forward, a need to investigate further, and a jailhouse informant. Mr. Carter died in the interim, and his proposed testimony was not preserved. As a result, the Petitioner requested a new attorney. The State filed a demand of notice of alibi in January 2011. As of one week before trial, trial counsel "appeared not to know" of Mr. Carter's passing away and "was still plowing ahead" with an alibi defense. The Petitioner agreed that they should have been proceeding with a third-party defense instead of an alibi defense. The

---

[10] The exhibit containing Ms. Harris's statement reflects that she identified a man named Wayne from whom the victim stole wheel rims.

Petitioner testified that trial counsel invoked defenses during closing arguments that "opened the door" for the State to challenge his lack of alibi in rebuttal.

The Petitioner testified that Darion's sighting of the victim and the Petitioner, which occurred between 10:30 p.m. and 11:00 p.m., took place before the victim's call to Ms. Washington indicating he was in a car with Big John.[11] The Petitioner noted that neither Big John nor Little John was charged in the car theft ring.

The Petitioner testified that he asked trial counsel to request a special jury instruction informing the jury that his "theft" charge was still pending and that the Petitioner was presumed innocent of those charges. No special jury instruction was given.

The Petitioner averred that trial counsel failed to object to references to the car theft ring or challenge the State's assertion that the Petitioner was part of the ring. The Petitioner noted that he was not charged jointly with any of the people involved in the ring, which included Mr. Criswell and Mr. Mason. Although the Petitioner was charged with burglary of a motor vehicle with two co-defendants, he maintained that he and the other two men were not part of the theft ring. The Petitioner noted that the victim's name did not appear in the discovery materials for his theft case and that there was no indication a confidential informant was used. The Petitioner testified that Sergeant Jackson's report indicated only that they were patrolling the area because multiple car break-ins had occurred recently and that some individuals were witnessed breaking into a car.

The Petitioner testified that the State initially told the trial court that it would only ask about the December 3, 2007 incident leading to the Petitioner's theft charge, but that "as soon as the door opened, [the jury] found out that [the Petitioner] was caught in a theft ring," which implied his being part of a criminal conspiracy and established a propensity toward that kind of criminal behavior. The Petitioner stated that he was not associated with "[that] group of people." The Petitioner said that "eighteen or nineteen different references" to the Petitioner's being part of the ring were made by the State, the trial court, and trial counsel.

The Petitioner testified that although Ms. Stornes was "impeached a lot" and gave inconsistent statements to both parties, he felt trial counsel should have impeached Ms. Stornes further. When asked how else Ms. Stornes should have been impeached, the Petitioner described a February 2009 court hearing in which the prosecutor claimed to have found incriminating evidence in jail telephone recordings, then stated in a later hearing that the recordings did not have significant evidence and would not be used. The

---

[11] Darion's trial testimony reflected that he saw the victim and the Petitioner at about 11:30 p.m.

recordings were contained on compact discs. Three months after the latter hearing, Ms. Stornes recanted her initial statement to Mr. Chapman. Eight months later in January 2010, Ms. Stornes testified that her recantation came about because Mr. Chapman came to her apartment several times, "so she told him what he wanted to hear" to make him leave. However, at trial, Ms. Stornes stated that the Petitioner called her from jail and said he would take care of his son if he were not incarcerated. The State argued that Ms. Stornes was persuaded to change her story in order to allow the Petitioner to have a relationship with their child. The Petitioner implicitly argued that trial counsel should have impeached Ms. Stornes more thoroughly on her changing her stated reason for recanting her multiple versions of events. He also indicated that trial counsel should have admitted records of the Petitioner's jail telephone calls to establish that the Petitioner never called Ms. Stornes.

The prosecutor interjected and stated that the State did not have jail telephone recordings in its file and that although the State referred to compact discs in the February 2009 hearing that needed to be provided to the defense, the discs contained notes and crime scene photographs, not recordings. After some discussion between the post-conviction court, the Petitioner, and post-conviction counsel, it was determined that the references to compact discs in the hearing transcripts did not specify the contents of the discs. The Petitioner stated that trial counsel and Mr. Chapman "kept telling [him] there were five CDs" of the recordings. Post-conviction counsel noted that defense memos with task lists included "listen to these CDs[.]" The prosecutor interjected that if the discs were part of the trial court file or were sent to this court as part of the record on direct appeal, it would explain why she did not have them.[12] The Petitioner stated that at a March 29, 2010 hearing, original counsel stated before withdrawing that original counsel and the State had gathered proof that the Petitioner was contacting a witness. The Petitioner opined that original counsel "allowed [the State] to sandbag the defense with these CDs that they never turned over" to the defense. The Petitioner agreed that the trial was continued to March 2009 due to the discs.

Excerpts of transcripts of various hearings were received as an exhibit. On February 25, 2009, original counsel stated that he needed additional time to complete the investigation, and the prosecutor noted that he also needed time to review motions filed by the defense. The prosecutor stated, "We've also got some – I believe I've got some CD's – I may need a copy for [original counsel] as well." No other discussion of the discs occurred in the remaining hearing excerpts. We note that no discussion of Mr. Walker occurred in the transcribed hearings.

---

[12] The record on direct appeal was not made an exhibit to the post-conviction record. However, we have examined the record, and it does not contain any discs.

The Petitioner testified that he filed bar complaints against original counsel, trial counsel, and post-conviction counsel. The Petitioner stated relative to original counsel and trial counsel that he wanted them to investigate, that they "never took [him] seriously because they always thought [he] was [going] to get a plea deal," and that as a result, they "never did a proper investigation or conduct[ed] any type of investigation [of] the case." The Petitioner acknowledged that if he had accepted the fifteen-year offer, he would be out of prison instead of serving a life sentence. The Petitioner stated that trial counsel told him "he wouldn't do [anything] other than what [original counsel] did because he was only being paid fifty dollars an hour," which "almost led . . to [them] getting into a little physical altercation[.]"

On cross-examination, the Petitioner acknowledged that Darion, Sergeant Stark, and Detective Jackson testified about the prior shooting involving Mr. Criswell. The Petitioner did not recall this court's concluding that no error occurred in the trial court's limiting the victim's mother's cross-examination. When asked whether the Petitioner wanted Mr. Criswell to testify about the prior shooting rather than Darion, the Petitioner responded that he wanted Rodney to testify. The Petitioner acknowledged that Mr. Criswell told police that the Petitioner said to him that he was "going to gun that b---h down," referring to the victim. The Petitioner denied having made such a statement. The Petitioner did not recall Mr. Criswell's statement to police that the Petitioner broke into cars with him and was part of the theft ring. The Petitioner clarified that he did not contend that trial counsel should have called Mr. Criswell as a witness, but rather that trial counsel promised the jury Mr. Criswell would testify and did not follow through.

The Petitioner testified that at trial, Ms. Washington did not identify the person to whom the victim referred in the second telephone call. The Petitioner stated that in Ms. Washington's police statement, she identified Little John's brother as the other person in the car. The Petitioner did not recall Ms. Washington's stating that during the third call with the victim, the victim said "someone" was in the car and he could not talk.

Relative to the text messages the victim received, the Petitioner testified that Mr. Willis sent the victim threatening messages saying, "F--k you N---a," and "It won't be long, you put the icing on the cake this time. It's won't be long, and you gone[.]" The Petitioner noted that he considered the messages threatening and that they came from a distinct telephone number belonging to Mr. Harris. Sergeant Stark's notes of the text messages were received as an exhibit and reflected six text messages between December 21 and December 22 from the same number. The first four were non-threatening, and the last two, which were sent between 7:00 p.m. and 9:00 p.m. on December 22, 2007, read, "Hoe u put tha icen on tha cake" and "Fu- u n-a it want be long u gone," respectively.

The Petitioner denied that Mr. Chapman sent a letter to Mr. Carter requesting information to confirm the Petitioner's alibi. The Petitioner stated that Mr. Chapman interviewed Mr. Carter over the telephone and told Mr. Carter he would follow up; however, Mr. Chapman did not follow up on any of four "exonerating" witness interviews. Original counsel began pursuing a plea agreement and did not "secure the alibi." The Petitioner noted that Mr. Carter posted his bond on Saturday, December 8, 2007. The following weekend, the Petitioner began working for Mr. Carter and continued to do so until mid-January 2008, when the Petitioner violated his probation "for some unrelated stuff." The Petitioner acknowledged receiving a letter from trial counsel regarding his investigation of the Petitioner's alibi, which was written before trial counsel realized Mr. Carter was deceased. The Petitioner did not frequent nightclubs and did not know the names of any individuals who could confirm he was with Mr. Carter on the night of the victim's murder. The Petitioner stated that Mr. Carter's assertion "it was possible [the Petitioner was] likely with him" was based upon Mr. Carter's memory alone "as a result of counsel not pursuing an alibi." When asked whether the Petitioner had presented any documentation supporting his alibi in his post-conviction petition, the Petitioner responded that he provided Mr. Carter's contact information to original counsel, that Mr. Chapman never called Mr. Carter back with the date the Petitioner was initially released from jail, and that there "was only so much [the Petitioner could] do" while in custody.

Relative to Mr. Neal, the Petitioner testified that if "they really wanted to find him," Mr. Neal had a case pending in Shelby County immediately before the Petitioner's trial, so it was possible to locate him. The Petitioner clarified that "the defense didn't take the extra steps to locate their witness." The court clerk stated that Mr. Neal was arraigned on January 7, 2011, and posted bond on June 8, 2011. The Petitioner noted that although Mr. Neal was located three days before trial and subpoenaed, he did not testify.

On redirect examination, the Petitioner testified that during the victim's telephone call to Ms. Harris at 10:42 p.m., the victim stated that he was making ten dollars with Big John. The victim was found with ten dollars in his pocket.

Upon examination by the post-conviction court, the Petitioner agreed that the burglary of a motor vehicle charge was the case in which the victim was alleged to have given information about the Petitioner. The court noted that charge was "nol. prossed." The Petitioner agreed that he was on probation at the time of the victim's murder for an aggravated assault. The Petitioner stated that trial counsel advised against his testifying because he could have been impeached with his criminal record. The court noted, "[t]here was a lot of stuff to impeach [the Petitioner] with[.]" The Petitioner acknowledged that the trial court examined him regarding his right to testify, but he stated that he "went with [trial] counsel" in spite of wishing to testify.

-30-

At the conclusion of evidence, the State noted that the Petitioner's amended post-conviction petition did not incorporate the pro se petition by reference and that the State's position was that all issues not raised in the amended petition were waived. Post-conviction counsel responded, "It also is ridiculously broad, so it definitely covers everything we talked about." The post-conviction court stated that it would consider all issues raised in both documents.

The post-conviction court made oral findings at the conclusion of the hearing. The court found relative to the Petitioner's alibi that "there was nothing to stop [the Petitioner] from testifying himself" and that the Petitioner would have offered "very good testimony" in spite of being open to impeachment with his criminal record. The court noted, "[Trial] counsel had already made the star witness look like a liar on the witness stand. I think that was pretty good because she changed her story so many times. And all that came out." The court further noted that it could not speculate as to what Mr. Carter would have testified and that the defense could have presented as witnesses a bartender or "bouncer" from the nightclub in question.

The post-conviction court denied the post-conviction petition in a written order filed on July 25, 2018. Relative to original counsel's investigating Mr. Carter, the court found that the Petitioner did not raise the issue of an alibi until the motion for a new trial and that original counsel interviewed Mr. Carter by telephone and used the information during plea negotiations. The court noted that the "extent to which an attorney investigates possible witnesses . . . is considered trial strategy and therefore is not to be second-guessed[.]" The court found that the Petitioner's alibi could have been confirmed by other witnesses, receipts, or the Petitioner's own testimony. The court further found that "whether the deceased witness in fact could have offered [the] Petitioner an alibi [was] a matter of pure speculation. The private investigator never received any definitive information, only a possibility." The court concluded that the Petitioner failed to show counsel was deficient in this regard.

Relative to the Petitioner's contention that the State "fabricate[d] evidence" and "engag[ed] in stall tactics" in an effort to delay the Petitioner's trial, the post-conviction court found that they were not supported by "any credible evidence" and that the Petitioner's "own actions were a leading cause of the delay in trial, specifically his failure to comply with court orders for mental examinations." Relative to trial counsel's investigation of the State's witnesses and preparedness to question those witnesses, the court found that a theory of third-party guilt was established but that "the jury obviously found it not to be compelling." The court concluded that the Petitioner's assertion was meritless.

-31-

Relative to trial counsel's alleged failure to object to "false, misleading, or prejudicial" testimony or evidence presented by the State, the post-conviction court found that the Petitioner failed to offer proof that any testimony or evidence was fabricated. The court noted that the Petitioner's "claim [was] essentially that his trial counsel did not advocate for [the] Petitioner's innocence or have his best interest in mind" even though trial counsel communicated the defense strategy and weaknesses in the defense's case. The court found that the admissibility of the complained-of statements was determined by the trial court and that trial counsel's failure to object to "admitted evidence and testimony" did not entitle the Petitioner to relief.

Relative to trial counsel's decisions not to file another corpus delicti motion, withdraw the existing corpus delicti motion, and engage in plea negotiations with the State, the post-conviction court found that decisions regarding whether to file motions were strategic. The court noted trial counsel's success in obtaining a possible plea offer of fifteen years, which the Petitioner rejected. The court also found that original counsel's alleged failure to have the corpus delicti motion argued "in a timely manner" was part of trial strategy and would not be second guessed. The court noted that the Petitioner had not shown how the motion would have succeeded and materially altered the outcome of the trial. The Petitioner timely appealed.

## ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103.

Relative to ineffective assistance, we have reorganized the issues raised in the Petitioner's appellate brief for clarity as follows: (1) original counsel's investigation and preservation of Mr. Carter's alibi testimony; (2) trial counsel's investigation and presentation of a third-party defense at trial; (3) trial counsel's decision to call or not call certain witnesses; (4) trial counsel's failure to object to false or prejudicial testimony and statements by the State in closing; (5) trial counsel's failure to impeach Ms. Stornes's reason for changing her statement; (6) trial counsel's failure to request a special jury instruction; (7) trial counsel's failure to object to testimony about the theft ring and counsel's eliciting testimony about the same; and (8) original counsel's failure to argue the motion to dismiss for lack of corpus delicti.

The Petitioner also requests that this court remand the case for a new post-conviction hearing in light of the post-conviction court's failure to make findings of fact and conclusions of law regarding trial counsel's raising a third-party defense and the special jury instruction.

As a preliminary matter, we note that although the trial transcript was not made an exhibit to the post-conviction hearing, both the Petitioner and the State have requested this court to examine the trial record as contained in the record on direct appeal. We have considered the available record, which in addition to the relevant trial proceedings includes only portions of some pretrial hearings after trial counsel was appointed. No hearings involving original counsel were transcribed.

In addition, we note that typically, if an amended petition does not incorporate a previous petition by reference, all issues not contained in the amended petition are waived. In particular, the amended post-conviction petition does not raise the third-party defense or special jury instruction issues. However, because the post-conviction court considered all of the Petitioner's issues, we will do so as well.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id.

### A. Post-Conviction court's findings

The Petitioner requests that this court remand his case for a new post-conviction hearing in light of the post-conviction court's failure to make findings of fact and conclusions of law regarding two of his issues on appeal. The State responds that the record is sufficient for this court to consider the Petitioner's issues. We agree with the State.

Tennessee Code Annotated section 40-30-111(b) states, "Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." Although the post-conviction court erred by failing to issue findings of fact or conclusions of law regarding the special jury instruction and third-party defense issues, the extensive proceedings in this case and the record on appeal are sufficient for this court to fully consider each of the Petitioner's issues. In such cases, the error is harmless and this court is not required to remand the case for a new hearing. See Patrick Rico Edwards v. State, No. M2014-01839-CCA-R3-

-33-

PC, 2016 WL 1161084, at \*6 (Tenn. Crim. App. Mar. 23, 2016). The Petitioner is not entitled to a new hearing on this basis, and we will consider each of his issues in turn.

### B. Ineffective Assistance of Counsel

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must

establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id. We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

1. Alibi witness

    *a) Investigation/preservation of testimony*

The Petitioner contends that original counsel provided ineffective assistance when he failed to follow up with Mr. Carter regarding the date on which the Petitioner was released from jail and failed to depose Mr. Carter before his untimely death. In support of his claim, the Petitioner argues that he informed original counsel of his alibi in May 2008; that Mr. Chapman only interviewed Mr. Carter once in May 2009; that Mr. Carter was a credible witness due to his being a military veteran[13] and retired police officer; and that original counsel was so focused on obtaining a plea offer that he did not investigate the alibi. The State responds that the Petitioner did not introduce any evidence to prove his alibi, that Mr. Carter did not provide sufficient details to comprise an alibi, and that Mr. Carter's claim was contradicted by both Ms. Stornes's and Darion's trial testimony.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

---

[13] We note that only Mr. Carter's prior police service was referenced in the post-conviction hearing and exhibits.

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

Due to the passage of time, original counsel did not recall any discussion of an alibi or Mr. Carter's illness. Mr. Chapman testified regarding his investigative memorandum, in which he stated that Mr. Carter was seriously ill with cancer. The post-conviction court found that original counsel had spoken to Mr. Carter by telephone, presumably through Mr. Chapman, and that counsel used the information during plea negotiations.

Even if we were to assume deficiency, the Petitioner has failed to prove prejudice arose from the lack of further investigation because he has not introduced what evidence would have been uncovered had counsel more thoroughly investigated Mr. Carter's claim. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. Apr. 11, 1990). Without any such evidence, Mr. Carter's information was sufficiently vague that we cannot say it definitively established an alibi that would have led to the Petitioner's acquittal in light of the overwhelming evidence of his guilt. We note that Mr. Carter's statement conflicted with the testimony of Ms. Stornes, Darion, and Mr. Orr regarding the Petitioner's whereabouts on the night of the victim's murder. Likewise, because Mr. Carter's statement did not sufficiently establish an alibi, we cannot conclude that the Petitioner was prejudiced by original counsel's failure to preserve Mr. Carter's testimony in a deposition.

The Petitioner has also raised for the first time on appeal that trial counsel should have called Mr. Chapman to testify as to the contents of Mr. Carter's statement, arguing that the testimony would have been admissible under the unavailable witness exception to the hearsay rule. See Tenn. R. Evid. 804.

We note that at the post-conviction hearing and in other sections of the appellate brief, the Petitioner faulted trial counsel for pursuing an alibi defense immediately before trial; he now argues that counsel should have introduced alibi evidence at trial. The Petitioner may not raise issues or change theories for the first time on appeal, and this issue has been waived. We note that Mr. Carter's statements to Mr. Chapman, which were made six months before his death, would have been inadmissible hearsay. See id.

-36-

(stating, in relevant part, that the statement of a deceased declarant is only admissible if it was made under oath; a dying declaration; a statement against interest; or when the declarant's unavailability was procured by the wrongdoing of the opposing party).

The Petitioner also raises a Fifth Amendment issue regarding the post-conviction court's commentary that relative to alibi, nothing prevented the Petitioner from testifying. The court's comment was not, as the Petitioner asserts, "using his silence [at trial] as a factor in . . . denying relief on this issue." Instead, the court was simply noting that the Petitioner's potential alibi defense was not necessarily dependent on Mr. Carter and could have been proven by outside evidence, including the Petitioner's testimony if he so chose. The comment related to the Petitioner's failing to prove prejudice because other avenues existed by which the Petitioner could have proven his alibi, even without Mr. Carter's testimony. The Petitioner's claim is without merit.

### b) Delay in proceedings

In a related issue, the Petitioner contends that original counsel allowed the State to "fabricate" issues to delay the trial, including needing to copy recordings of jail telephone calls and using Mr. Walker as a jailhouse informant, neither of which ultimately were presented at trial. The Petitioner has not proven that any such jail telephone call recordings exist or do not exist; he merely concludes that because the discs were not in the parties' post-conviction files, the issue was fabricated. We note that no such discs were contained in the record on direct appeal.

Regardless, in contrast to the Petitioner's contentions that the discs were a major issue leading to a lengthy delay of his trial, the trial record reflects that the one reference made to compact discs did not specify that they contained jail telephone calls, and the prosecutor recalled at the post-conviction hearing that the discs contained photographs and other discovery materials. The only continuance even tangentially related to the discs was one month in length.

Moreover, the Petitioner has failed to prove that the State engaged in any wrongdoing relative to requesting continuances, that any evidence was fabricated, or that the State dealt with the trial court in bad faith. The record reflects that the majority of the continuances in the Petitioner's trial occurred because original counsel or the State needed to conduct further investigation; the State needed to review information and motions provided by original counsel; and the court calendar required a reset, not due to any improper delay tactics. Further, a significant portion of the delay was attributable to the Petitioner's not cooperating with his court-ordered mental evaluation. We note this court's conclusion on direct appeal that the Petitioner's speedy trial rights were not violated in this case because much of the delay was caused by the Petitioner. The

-37-

Petitioner has not established that original counsel was deficient or that he was prejudiced in this regard.

2.  Third-party defense

The Petitioner contends that trial counsel was ineffective in his investigation and presentation of a third-party defense. He argues that trial counsel should have better investigated Rodney, Mr. Neal, Mr. Criswell, Mr. Mason, and Mr. Willis; counsel should have called Rodney, Mr. Stevenson, Mr. Neal, and Mr. Chapman as witnesses; trial counsel should have generally been better prepared to question the witnesses to elicit testimony regarding a third party's motive to kill the victim; trial counsel should have investigated the threatening text messages from Mr. Willis; and trial counsel should have investigated the photographed tire tracks found next to the victim's car. The Petitioner further argues that trial counsel's lack of investigation was evident from his pursuing an alibi theory only days before trial.

The State responds that the investigative memoranda and trial counsel's examination of the witnesses at trial reflect a thorough investigation, that third-party evidence was brought out and rejected by the jury, and that the Petitioner has not shown what evidence could have been found by further investigation of the tire tracks.

Relative to third-party guilt, the record reflects that trial counsel elicited testimony where possible regarding other people in the theft ring with motive to kill the victim and pursued a third-party defense. Detective Jackson and Sergeant Stark named other members of the theft ring, including which ones were arrested as a result of the information provided by the victim. Darion testified regarding the previous shooting. Trial counsel also attempted to question Mr. Stevenson about an argument during which Mr. Neal threatened the victim, but the trial court found the incident was not relevant to the murder. The jury, by its verdict, rejected the third-party defense.

Although this strategy did not ultimately have the desired effect, the fact that a trial strategy was unsuccessful does not mean counsel was deficient for attempting it. We will not deem counsel to have been ineffective merely because a different strategy might have produced a more favorable result. See Rhoden, 816 S.W.2d at 60. Moreover, the Petitioner has not presented what further investigation would have yielded to aid trial counsel in effectively examining the witnesses—he merely recounts information that was already available to trial counsel in discovery and the defense file. See Black, 794 S.W.2d at 757. The Petitioner is not entitled to relief on this basis.

Relative to calling Rodney and Mr. Neal as witnesses, they did not testify at the post-conviction hearing; the Petitioner's argument is without merit in this regard. See id.,

794 S.W.2d at 757.[14]   Relative to Mr. Chapman, the Petitioner has not shown that his hearsay testimony relative to Mr. Neal's threatening the victim would have been admissible.  Relative to Mr. Stevenson, he testified that he did not remember discussing Mr. Neal with police.  The Petitioner has not proven that Mr. Stevenson's testimony would have assisted his defense.  He is not entitled to relief on this basis.

Relative to trial counsel's questioning witnesses at trial, the Petitioner argues that he failed to question Ms. Washington, Sergeant Stark, and Mr. Harris in order to elicit that Big John was in the victim's car before his death.  Sergeant Stark's knowledge of Ms. Washington's statement would have been inadmissible hearsay.  Ms. Washington's statement to police was that the victim was "[f]ixing to drop off Big John," but when asked at trial whether her conversation with the victim gave her an impression of who was accompanying him, she answered negatively, and trial counsel did not impeach her with her police statement.  Counsel attempted to ask Ms. Washington with whom the victim said he was, but ultimately counsel was barred by the trial court from doing so on the basis of hearsay.  Mr. Harris testified that he could not identify the occupants of the victim's car because of its tinted windows, and the record contains no contradictory statements from him about the identity of the victim's companion.

Although trial counsel's questioning of Ms. Washington was inartful and failed to elicit the victim's state of mind or future intent, which would have been admissible to bring out that Big John was with the victim during a portion of the evening, the Petitioner has not proven that prejudice arose.  The jury heard multiple witnesses testify regarding third parties' motive to kill the victim and, by its verdict, rejected this theory.  In addition, the jury would have been instructed that the statement was not admissible to prove that Big John was with the victim, but only the victim's future intent.  The Petitioner is not entitled to relief on this basis.

Relative to Mr. Willis's text messages, we note that the relevant messages were sent after the timeframe in which the victim was murdered.  The Petitioner has not shown how, in light of the evidence establishing multiple people had a grudge against the victim, arguably threatening messages sent after the victim had been murdered would have changed the outcome of his trial.  Likewise, the Petitioner has not presented evidence of what further investigation into the tire marks would have produced or if that information would have been helpful to the defense, let alone that it would have changed the outcome of the case.  See Black, 794 S.W.2d at 757.  The Petitioner is not entitled to relief on this basis.

---

[14] We acknowledge that Rodney was deceased at the time of the hearing and was not available to testify. However, his police interview indicated that he both implicated Wayne as the victim's shooter and told police that the Petitioner had shot another person earlier that year, which would not have necessarily helped the Petitioner's case.

Finally, we note that the Petitioner's complaint regarding trial counsel's pursuing an alibi theory before trial appears to be based upon a letter authored by counsel's legal assistant after reviewing Mr. Chapman's previous memorandum. Contrary to the Petitioner's impliedly arguing that trial counsel could not simultaneously prepare a third party defense while considering alibi information, reviewing the alibi information in the file did not preclude trial counsel from investigating third parties. Indeed, trial counsel's letter to the Petitioner affirmed that the main defense strategy was based upon creating reasonable doubt by introducing third parties' shared motive to kill the victim; likewise, at trial, trial counsel fully pursued a defense theory of third-party guilt. The Petitioner is not entitled to relief on this basis.

## 3. Closing arguments

The Petitioner contends that trial counsel was ineffective because he did not object to the prosecutor's comment during closing arguments on the Petitioner's lack of an alibi. This issue was considered on direct appeal, and this court concluded that the comments were brief and had "little, if any, effect on the jury's verdict." Lanier, 2013 WL 5739793, at *17. The Petitioner has not established that any improper comments were prejudicial, and he is not entitled to relief on this basis.

## 4. Ms. Stornes

The Petitioner contends that trial counsel was ineffective in his impeachment of Ms. Stornes's stated reasoning for changing her statement. Ms. Stornes testified at trial that she changed her initial statement because the Petitioner contacted her from jail and stated that he wanted to co-parent their child. However, original counsel[15] told Mr. Chapman that she told the State that she made up a story to stop Mr. Chapman from harassing her. The Petitioner argues that counsel should have introduced recorded jail telephone calls to prove that the Petitioner did not contact her. Likewise, the Petitioner argues that counsel should have called Mr. Chapman to testify regarding what he was told. The State responds that trial counsel's decisions were sound trial strategy and that Mr. Chapman's testimony would have been double hearsay.

Relative to the jail telephone calls, the Petitioner has not introduced any such recordings, and we cannot speculate as to their contents. See Black, 794 S.W.2d at 757. Relative to Mr. Chapman, the Petitioner has not shown how his testimony regarding Ms. Stornes's statement as conveyed to Mr. Chapman would have been admissible.

---

[15] Mr. Chapman's memorandum reflects that original counsel, not the prosecutor, conveyed this information.

Trial counsel testified that it was his general strategy not to present redundant testimony, and we note that counsel thoroughly impeached Ms. Stornes at trial. The record supports the post-conviction court's statement that counsel made Ms. Stornes "look like a liar." The Petitioner has not proven that counsel was deficient in his impeachment of Ms. Stornes or that the Petitioner was prejudiced. He is not entitled to relief on this basis.

5. Jury instruction

The Petitioner contends that trial counsel was ineffective for failing to request a special jury instruction regarding references to his pending charges related to the theft ring, specifically that the Petitioner had not yet been convicted and as a result was presumed innocent of those charges. The State responds that an appropriate limiting instruction was given and that the Petitioner did not propose an alternative or additional instruction at the hearing.

Although the post-conviction court did not address this contention in its order, the record is sufficient for us to examine the issue. At the post-conviction hearing, the Petitioner testified that he requested trial counsel to submit a special jury instruction regarding his presumed innocence of the pending theft charges. Trial counsel acknowledged that he did not request such an instruction. According to the trial record, Sergeant Stark and Detective Jackson both testified regarding the Petitioner's pending charges and the victim's role in the Petitioner's arrest. The jury was instructed that any acts of prior misconduct were only to be considered for the limited purpose of determining the Petitioner's motive to murder the victim.

The trial record also reflects that trial counsel challenged such evidence and that after a jury-out hearing, the trial court found it was admissible for the limited purpose of proving the Petitioner's motive. Given that the testimony was found to be admissible and the jury was given an appropriate limiting instruction, the Petitioner has not demonstrated that the trial court would have accepted an additional instruction or how the instruction would have changed the jury's verdict. Because the Petitioner has not proven prejudice, he is not entitled to relief on this basis.

6. Statements regarding the theft ring

The Petitioner contends that trial counsel was ineffective for failing to object to references to the theft ring, arguing that the evidence did not establish he was part of the ring and that the evidence was unfairly prejudicial. The State responds that this issue has been waived for failure to support the issue with legal authority, that the Petitioner cited to statements made out of the presence of the jury, that the Petitioner has failed to

establish he was not part of the ring, that the testimony opening the door to discussion of the ring was elicited as part of the third-party defense, and that the jury received a limiting instruction regarding the references.

As a preliminary matter, we note that many of the citations to the trial record in the Petitioner's brief were to jury-out hearings, bench conferences, or exchanges in which the theft ring is not mentioned. Because they were either irrelevant to the issue or did not affect the jury, the Petitioner has not proven any deficiency or prejudice arose in connection with those portions of the trial. The remaining references occurred during the police officer's testimony and both parties' closing arguments.

The record reflects that the references to the theft ring were ultimately beneficial to both the State and the defense, establishing a motive for the killing as well as the existence of multiple third parties with the same motive. Upon trial counsel's objection to the references, a Rule 404(b) jury-out hearing was held, and the trial court determined the references were admissible for the limited purpose of proving motive. The jury was given a limiting instruction regarding the Petitioner's other criminal acts. Trial counsel was not deficient for failing to continue to object in light of the trial court's ruling on the matter, nor was he deficient for utilizing testimony regarding the theft ring to further the third-party defense theory. The Petitioner is not entitled to relief on this basis.

7. Corpus delicti motion

The Petitioner contends that original counsel was ineffective for failing to argue the corpus delicti motion and withdrawing it. The Petitioner cites original counsel's testimony that the motion would have been well-taken had it been argued. The State responds that the issue has been waived for lack of citation to legal authority, that the motion would not have prevailed even under pre-Bishop jurisprudence, and that the decision to withdraw the motion and negotiate a plea was strategic.

Corpus delicti, meaning literally "the body of the crime," consists of two elements: (1) the death of a human being; and (2) a criminal agency in producing that death. State v. Driver, 634 S.W.2d 601 (Tenn. Crim. App. 1981); see also State v. Ellis, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000). "The corpus delicti rule does not require corroboration of the defendant's identity as the perpetrator." Bishop, 431 S.W.3d at 47. The traditional corpus delicti rule dictated that the State "need only corroborate the existence of the core injury associated with the crime, plus the fact that the injury did not occur accidentally or innocently." Id. (citing Miller v. State, 380 Md. 1, 843 A.2d 803, 830 (2004); 1 McCormick on Evidence § 146, at 810-11.). The purpose of the rule was to ensure that a crime had, in fact, been committed. See id. at 46-47.

We think that original counsel was mistaken in his assessment of the motion's likelihood of success. Contrary to counsel's assertion that the State's case was wholly comprised of Ms. Stornes's statement, the victim's body had been located and clearly reflected a violent death by shooting. No evidence at the crime scene suggested his death was a suicide. It was apparent that the victim was deceased and that his death was the result of a crime. That evidence alone was sufficient to satisfy the pre-<u>Bishop</u> corpus delicti rule, and the motion to dismiss would have been denied. The Petitioner has, therefore, not proven that he was prejudiced and is not entitled to relief on this basis.

<u>CONCLUSION</u>

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE